# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF IDAHO

**In Re:**

STEVEN J. RULE,

       **Debtor.**

**Bankruptcy Case
No. 04-01799**

---

NANCY ROE, DIANE
JOHNSON and WALLY
OLSON, AS PERSONAL
REPRESENTATIVES FOR THE
ESTATE OF JO ANN OLSON
AND OLSON & OLSON, LLC.,

       **Plaintiffs,**

**vs.**

RULE SALES & SERVICES,
INC., an Idaho corporation, and
STEVEN RULE, an individual,

       **Defendants.**

**Adv.  Proceeding No. 04-6190**

---

## MEMORANDUM OF DECISION

---

**Appearances:**

       Scott D. Hess and Terri R. Yost, JONES GLEDHILL HESS FUHRMAN
& EIDEN, Boise, Idaho, Attorneys for Plaintiffs.

       William A. McCurdy, Boise, Idaho, Attorney for Defendant.

MEMORANDUM OF DECISION - 1

In this adversary proceeding, Plaintiffs contend that a $400,000 state court judgment entered in their favor against Defendant Steven Rule, a Chapter 7 debtor, should be excepted from discharge in bankruptcy. The Court conducted a three-day trial at which the parties presented the testimony of several witnesses and submitted dozens of documentary exhibits. At the conclusion of the trial, the parties submitted written closing arguments. Docket Nos. 46–49. The Court has reviewed and considered all the evidence, testimony and the arguments of the parties, and the issues are now ripe for disposition. The following constitutes the Court's findings of fact and conclusions of law, and decision. Fed. R. Bankr. P. 7052.

## Findings of Fact[1]

### The Agreements.

Plaintiffs Nancy Roe, Diane Johnson, and Wally Olson are the children of the late Jo Ann Olson. The children  prosecute this adversary proceeding on behalf of their deceased mother's probate estate. In addition, the various family members conducted business via Olson & Olson, LLC (sometimes

---

[1] These findings include both disputed and undisputed facts. In deciding disputed issues of fact, the Court carefully considered the testimony of the witnesses, and based upon its opportunity to observe them testify, assessed their credibility. The Court's findings reflect its judgment on the weight to be given to that testimony.

MEMORANDUM OF DECISION - 2

referred to as "the company"), which entity has joined as a plaintiff in this action.[2]

Plaintiffs have owned a parcel of real properly located on Centennial Way in Caldwell, Idaho for the past twenty years. Jo Ann Olson, acting through the company, decided to develop the property by building an automated car wash on the site. Jo Ann Olson came to this conclusion after consultation with her accountant and advisor, John Frye,[3] as well as after several discussions with her children about the development possibilities. Mr. Frye recommended that Plaintiffs consider asking Defendant Steven Rule, who did business as Rule Sales & Service, Inc.,[4] to serve as the contractor for the project.[5] Defendant had been in business for several years selling and installing car wash equipment as a local distributor for at least two different manufacturers. In addition, Defendant had

---

[2] Except where significant, the Court will refer to the Plaintiffs collectively.

[3] John Frye did not testify. Plaintiffs did not call him as a witness. Defendants were not allowed to call him as a sanction for their unjustified failure to comply with the Court's Pre-Trial Order requiring disclosure of witnesses prior to trial. *See* Docket No. 9. Defendants did not disclose any intent to call Mr. Frye.

[4] Plaintiffs named Rule Sales & Service as a defendant in this action. However, because the issue here is the dischargability of the money judgment Plaintiffs hold against Defendants, and because Rule Sales & Service is not a debtor in bankruptcy, the Court's determination will have no effect upon the liability of Rule Sales & Service, Inc. For convenience, when the Court refers to the Defendant, it includes those instances where Rule was acting through and on behalf of the corporation.

[5] Apparently, Rule was another accounting client of Mr. Frye.

MEMORANDUM OF DECISION - 3

undertaken several comprehensive car wash construction projects for clients in the Treasure Valley.

When Plaintiff Nancy Roe and Jo Ann Olson first met with Defendant and his salesman in 1997 or 1998 to discuss a possible car wash project, they did not particularly like either man.  As a result, planning the project was abandoned for a time.   However, in July 2000, Jo Ann Olson decided to proceed with the development.  Jo Ann Olson, John Frye, Diane Johnson and her husband again met with Defendant in August.  Defendant gave them literature about the kinds of equipment he sold.  On September 28 and 29, 2000, Olson, acting on behalf of the company, entered into two agreements with Defendant to purchase the automated car wash equipment.  *See* Exs. 13 and 14.  In addition, the next day, she signed an agreement Defendant had prepared (the "Management Agreement") providing that he would  manage and supervise all aspects of the construction of the car wash.  *See* Ex. 1.

Plaintiffs expressed their desire to Defendant to build a "top-of-the-line" car wash and believed Defendant's ideas would accomplish this goal.  Originally, Plaintiffs contemplated building a facility with one automatic car wash bay and three self-service bays.  However, during construction, Plaintiffs decided to replace one bay with a coffee shop.

MEMORANDUM OF DECISION - 4

As previously noted, Plaintiffs entered into separate agreements with Defendant to purchase the essential equipment to wash cars.  In one of these purchase agreements, Plaintiffs agreed to buy a Vector Rapid Wash System from Defendant for use in the automatic car wash bay.  The total price Plaintiffs agreed to pay Defendant for this system, including a $6,000.00 installation fee, was $126,122.00.  Ex. 13.  For the three self-service bays, Plaintiffs agreed to buy the GinSan Ultimate System from Defendant.  The total price for this equipment was $88,341.26, which included $4,900.00 for "labor to erect equipment."  Ex. 14. The Airlift Door Package for the car wash was purchased for  a total price of $11,970.80.  Ex. 15

As an equipment dealer, Defendant sold the equipment to Plaintiffs at a substantial markup over his cost.  Defendant's cost for the Vector Rapid Wash System was $72,500.00, Ex. 16; $39,220.00 for the GinSan equipment Ex. 17; and $6,934.68 for the Airlift Doors, Ex. 18.  But, the total cost Plaintiffs agreed to pay Defendant for the car wash equipment was $226,434.14.

Plaintiffs Nancy Roe and Diane Johnson testified that at no time during the negotiations and discussions concerning the project did Defendant disclose to them that he would be making a profit on the sale of the equipment. By the same token, there is no evidence, either in the written purchase orders or otherwise, that Defendant agreed to sell the equipment to Plaintiffs at his cost, or

MEMORANDUM OF DECISION - 5

at some other discount.  Moreover, as noted above, Plaintiffs agreed to purchase the equipment from Defendant before retaining him to manage the construction of the car wash.

In the Management Agreement, Defendant committed to supervise the construction of the car wash, including selecting, negotiating contracts with, and supervising the work of  all subcontractors and vendors.  For his efforts, the agreement provided that Plaintiffs would pay Defendant a management fee.  In particular, the Agreement provided that "Rule is [to be] paid 8% of total project cost, (est. total cost $500,000.00) or an estimated management cost of $40,000.00. 50% ($20,000.00) paid upfront [sic], 50% ($20,000) paid on job start up."  Ex. 1.

**The Business Relationship Deteriorates.**

A considerable delay preceded the commencement of construction. And, unfortunately, the car wash project did not progress as quickly as the parties hoped.   Indeed, several practical and legal challenges to prompt completion of the car wash developed.

For example, with Defendant's support, Plaintiffs decided it would be beneficial to expand access to the property by adding a second entrance off of Centennial Way.  Defendant endeavored to secure the approval of the local authorities for such a change, including hiring engineers to design the access, but

MEMORANDUM OF DECISION - 6

there were complications.  Attempts to resolve these problems took considerable

time and generated expense before the idea was ultimately abandoned due to cost.

In addition, subcontractors encountered issues with the presence of underground

utilities and easements in excavating for the project.  Finally, as noted above,

Plaintiffs decided to modify the construction plans to include the coffee shop

which, while not an unexpected decision, resulted in additional delay and expense.

During construction in the late summer and early fall of 2001, the

business relationship between Plaintiffs and Defendant became strained.  Jo Ann

Olson became very ill.  When Defendant asked Plaintiffs for additional funds that

would exceed the estimated $500,000 cost referred to in the Management

Agreement, Plaintiffs refused to advance them without a detailed accounting of

how the $470,000 they had already paid had been spent.   More particularly, the

following occurred.

In July 2001, Defendant met with Plaintiffs Diane Johnson and

Nancy Roe, along with Nancy Roe's husband, at Jo Ann Olson's home to discuss

the progress of the project.  Jo Ann Olson was not in attendance at the meeting due

to illness, and it was around this time that Jo Ann Olson turned over supervision of

the project to her daughters.  During this meeting Plaintiffs asked Defendant if the

project would be completed for $500,000.  Defendant indicated he thought that it

would.  Defendant testified that by saying this, he meant the cost for the car wash

MEMORANDUM OF DECISION - 7

building would amount to about $500,000.  However, he felt the family members

understood that this figure did not include the cost of the car wash equipment of

over $200,000.  To support his conclusion, Defendant testified that John Frye,

who was coordinating discussions and dealings during construction between Jo

Ann Olson and Defendant, was always aware that the cost of the car wash project

would be around $750,000.  However, both Jo Ann Olson and her daughters

testified that at all times they believed the car wash project, including the

equipment, would cost $500,000.

By August 2001, Plaintiffs had paid Defendant $470,000 towards

the completion of the car wash.  It was not finished.  By this time, Jo Ann Olson

was no longer involved and her daughters had stepped in to handle the car wash

construction project for the family.  On August 13, 2001, Defendant produced and

sent Jo Ann Olson a document described as a "construction project statement

delivered to Western Bank as per John Frye."  Ex. 3.  The statement indicated the

"estimated project total costs of $500,000.00" and that a "progress payment of

30% of estimated project costs $150,000.00" was due.  Ex. 3.  Defendant sent

Plaintiffs a similar statement again on September 7, 2001, also indicating an

estimated total project cost of $500,000.00.  Ex. 4.

On September 18, 2001, after Defendant had requested two more

progress payments, Plaintiffs sent a letter to Defendant requesting a full

MEMORANDUM OF DECISION - 8

accounting for the car wash project. Ex. 5. In his September 21, 2001, response to this letter, Defendant indicated he was offended by the request for information supporting his request because providing such an accounting was not included in the parties' agreement. Ex. 6. Even so, Defendant partially accounted for the project's costs by indicating,

> To date Olsons have paid Rule thru [sic] deposits and progress payments $470,000.00 dollars. Rule has provided equipment, site work, building costs, permitting fees, archectic [sic] & engineering fees totaling $368,838.33. That leaves a $132,000.00 balance of the $500,000.00 projected costs. Costs for lanscaping [sic], asphalt, roofing, painting, signage should total about $130,000.00 as I had projected.
>
> Additional costs ordered by Jo Ann Olson and John Frye not included in the original estimates are the coffee shop costs ($42,918,39) water and sewer line repairs ($6,748,30), permits and fees ($41,895.80).
>
> Total Project Costs to Date:
>
> | | |
> |---|---|
> | Car Wash Equipment | $226,434.05 |
> | Site Work and Car Wash Building | $142,404.05 |
> | Trailer Court Sewer and Water Repairs | $   6,748.30 |
> | Permits and Fees | $ 41,895.80 |
> | Coffee Shop Construction to Date [ ] | $ 42,918.39 |
>
> To continue the car wash project Olsons will need a progress payment of $130,000.00 to the Rules [sic] construction account. As I stated before the car wash is built with the customers [sic] money, not Rules [sic] money.

MEMORANDUM OF DECISION - 9

Ex. 6.[6]

Plaintiffs refused to make the $130,000 payment.  After additional
meetings with Plaintiffs Diane Johnson and Nancy Roe regarding the progress of
the project, Defendant walked off the job on September 29, 2001.  Plaintiffs took
over management of the project and finally finished the car wash in March or
April of 2002.  The total cost of the project paid by Plaintiffs was between
$810,000 and $820,000.

**While It is Disputed, the Car Wash Equipment was Included in the
<u>Estimated</u> Total Project Cost.**

Defendant plausibly testified that he was asked to draft a
Management Agreement containing an estimate of the total cost of the project to
allow Plaintiffs to arrange their financing for the project.  He did so.

One of the critical factual controversies in this action concerns
whether the estimated $500,000 "total project cost" included by Defendant in the
Management Agreement signed by the parties was intended to include the cost of
the automated car wash equipment sold by Defendant to Plaintiffs.  Defendant
testified the $500,000 figure was intended as an estimate for the building, and that

---

[6] Obviously, Defendant's reasoning, as well as his math, is difficult to follow.  In
one paragraph of his response, Defendant seems to imply the project cost is in line with
the original $500,000 estimate.  Even so, he asks for an additional $130,000.00 payment
in order to continue the project.

MEMORANDUM OF DECISION - 10

the contracts to purchase the car wash equipment represented separate, additional

costs.  The record belies Defendant's position.  While Rule's testimony on this

point provides a simplistic method of reconciling his otherwise inconsistent

accountings for the costs of this project, the Court finds, based largely upon the

information Defendant himself provided concerning the cost of the project,

together with the plain meaning of the language employed in the Management

Agreement, that the parties intended the cost estimate in the Management

Agreement to include the cost of car wash equipment.

Even so, while the $500,000 figure in the Management Agreement

was intended by the parties to reflect the total project cost, the Court also finds,

consistent with Defendant's position, that this number constituted, at best, an

educated guess of the cost of this project.  And as things turned out, it was a poor

guess at that.

On the other hand, the Court believes Rule when he testified that,

from very early on, "everyone" involved in the project appreciated the total cost

would greatly exceed $500,000.  Clearly, it would have been impossible for the

parties to precisely predict months in advance all the conceivable costs for a

project such as the construction of a commercial facility.   The Agreement itself

correctly labels this number an "estimate."   At the time the Agreement was inked,

no car wash construction plans had been drawn, no permits had been issued, and

MEMORANDUM OF DECISION - 11

the scope of the project had not yet been completely defined.  The testimony of the

parties was consistent that there were discussions regarding the challenges incident

to the addition of a second "curb-cut" and "deceleration lane" to provide another

street access to the car wash.  Ultimately, it was decided that such an addition was

cost prohibitive, but clearly time and effort was expended to look into this issue.

There were also additional unforseen issues such as the unanticipated presence of

active sewer lines on the property relating to its former use as a mobile home park.

All things considered, there is no doubt that when the Management

Agreement was signed and the project was first begun, the full scope of the work

necessary to build this car wash was not known by the parties to any significant

degree of certainty.   It is therefore clear that while the $500,000 figure inserted by

Defendant in the Management Agreement was intended to reflect "total project

costs," including the equipment, that number was, as it turned out, merely an

overly optimistic guess.

### The Documents Also Show the Project Would Inevitably Cost More than $500,000.

While Plaintiffs maintain they did not know the project would cost

more than $500,000 until the late summer of 2001, very early on Defendants gave

Plaintiffs a breakdown of the anticipated construction costs indicating that

construction of the building would cost approximately $308,663.52, to which

MEMORANDUM OF DECISION - 12

additional expenses such as $42,918 for the coffee shop and $41,895 for some utilities and permits, would have to be added.  Ex. 2.  Nancy Roe testified she understood that the addition of a coffee shop in place of one of the bays would cost an additional $43,000 over the estimated cost of $500,000.  In addition, since the purchase orders for the equipment were executed before the Management Agreement, Plaintiffs were also aware that the price of the equipment was $226,434.14.

Had Plaintiffs reviewed the documents they were provided, they would that have known that, even before construction commenced, the costs to build the type of car wash they wanted would likely run at least $619,910.66, without any allowance for Defendant's management fee, and assuming no unforseen complications occurred.  Nancy Roe testified she had not seen the estimated building cost until she was going through Jo Ann Olson's files after the project was turned over to her.  However, it is clear that at least Jo Ann Olson had been given this document.  And even if the handwritten numbers appearing on this document are not included in the estimate, the cost to build the car wash building plus the equipment cost significantly exceeded $500,000.

In short, from the inception of the project, and more so as time passed,  Plaintiffs knew, or should have known, that the cost of the car wash would be more than Defendant's estimate of  $500,000.

MEMORANDUM OF DECISION - 13

**Plaintiffs Relied on the Advice of Others.**

Through the testimony of Plaintiffs Nancy Roe and Diane Johnson it was obvious that Plaintiffs, and especially Jo Ann Olson,  relied heavily on the advice of others in connection with making decisions about the car wash project. As noted, John Frye apparently recommended that Plaintiffs hire Defendant for this job, even though they did not initially care for him or his salesman.  Mr. Frye also acted as a go-between during the project for communications between Defendant and Jo Ann Olson.  Diane Johnson testified that Plaintiffs did no independent research regarding this project, secured no other bids for any aspect of the project, and only looked at the brochures Defendant provided for the equipment he sold before purchasing the equipment from Defendant.  Plaintiffs had nothing with which to compare Defendant's prices and cost estimate, nor did they endeavor to gather any such information.

**The Lien.**

After ceasing work, on October 5, 2001, Defendant, with the advice and assistance of his attorney, signed and caused to be recorded a statutory Claim of Lien against the car wash property.  In this lien claim, Defendant asserted he was owed $168,342.72.  Ex. 22.  Defendant testified that this amount was calculated by Rule Sales & Service's bookkeeper/office manager as that needed to pay off  all the outstanding claims of subcontractors for work performed on the

MEMORANDUM OF DECISION - 14

property, together with his accrued management fee.  Plaintiffs testified that, after

taking over the project, they paid subcontractors over $100,000 for goods and

services provided before Defendant walked off the job.  That they did pay this

amount actually supports the credibility of the amount due stated in Defendant's

lien claim.

One year later, Debtor amended his Claim of Lien to $16,315.66.

Ex. 23.  Debtor testified this amendment reflected payments made by Plaintiffs to

subcontractors, leaving only Debtor's management fee outstanding.

**The State Court Action.**

Plaintiffs sued Defendant and his company in state court claiming

breach of contract, breach of fiduciary duty, fraud and slander of title.  The parties

tentatively settled the issues the day trial was to begin, and recited a stipulation on

the record.  Apparently, as a result of their negotiations, Defendant agreed to pay

$30,000 to Plaintiffs, and to release the lien on the car wash property.  However,

problems arose in documenting the deal.  When Defendant would not sign

Plaintiffs' version of the settlement documents, on September 4, 2003, at

Plaintiffs' request and over Defendants' objection, the state court entered a

judgment against Defendant in the amount of $400,000 and ordered the lien

released.  In its judgment, the court awarded $100,000 to Plaintiffs for damages

arising out of their breach of contract claim; $200,000 for damages arising out of

MEMORANDUM OF DECISION - 15

their breach of fiduciary duty, fraud, and slander of title claims; and $50,000 in

punitive damages.  Ex. 26, 33.[7]

Defendant filed for relief under Chapter 7 of the Bankruptcy Code on May

19, 2004.  Plaintiffs timely commenced this adversary proceeding on August 24,

2004.

### The Parties' Arguments

Plaintiffs' Amended Complaint seeks a declaration that the debt

Defendant owes them under the state court judgment is excepted from discharge in

bankruptcy under § § 523(a)(2)(A), (a)(2)(B), (a)(4) and (a)(6).[8]  Plaintiffs contend

Debtor defrauded them by representing at various times during his involvement in

the construction project that the car wash would cost $500,000 to complete, when

he knew the actual cost would be closer to $750,000.  Plaintiffs also argue

Defendant willfully and maliciously damaged their property by recording an

---

[7]   To the Court, the basis for the state court's judgment is unclear.  It seems to represent a default judgment on the merits based upon Defendants' failure to cooperate in effectuating the terms of the settlement agreement.  Because of the curious nature of the proceedings below, this Court ruled that the state court judgment was not entitled to preclusive effect to establish the elements of Plaintiffs' nondischargeability claims.  *See* Memorandum Decision and Order, Docket Nos. 24 and 25.

[8]   Unless otherwise noted, all section and chapter references are to the Bankruptcy Code, 11 U.S.C. §§101-1330, and all Rule references are to the Federal Rules of Bankruptcy Procedure.

MEMORANDUM OF DECISION - 16

inflated Claim of Lien after walking off the job, preventing them from refinancing their loan on the property.

Defendant characterizes this action as a business dispute, and insists that even if he breached his contract with Plaintiffs, he committed no fraud. Defendant contends the Plaintiffs always understood the total price of the project would be closer to $750,000. Defendant argues that he recorded the lien claim because he had not been paid money he believed in good faith he was owed pursuant to the Management Agreement, and that he needed to pay subcontractors.

### Conclusions of Law and Analysis

### A. Debtor's Rule 52(c) Motion

First, some housekeeping.

After Plaintiffs presented their case at trial, Defendant orally moved for judgment on partial findings. Fed. R. Civ. P 52(c), which applies to adversary proceedings by incorporation via Rule 7052, provides in part,

> If during a trial without a jury a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue[.]

MEMORANDUM OF DECISION - 17

Fed. R. Civ. P. 52(c).  After argument by the parties, the Court orally granted

Defendant's motion as to Plaintiffs' § 523(a)(2)(B) and § 523(a)(4) claims.  The

Court takes this opportunity to explain the reasons for its decision.

> **1.      Plaintiffs Failed to Make a Prima Facie Case
>           Under § 523(a)(2)(B).**

Section 523(a)(2)(B) prevents discharge of a debt in bankruptcy

when the debt was incurred by the

> (B) use of a statement in writing–
>           (I) that is materially false;
>           (ii) respecting the debtor's or an insider's financial
>           condition;
>           (iii) on which the creditor to whom the debtor is liable
>           for such money, property, services, or credit
>           reasonably relied; and
>           (iv) that the debtor causes to be made or
>           published with intent to deceive[.]

Plaintiffs claimed an exception to discharge was proper under both § 523(a)(2)(A)

and § 523(a)(2)(B).  The Ninth Circuit has held, "as a plain reading of the statute

shows, parts (A) and (B) are mutually exclusive, the former referring to

representations other than those respecting the debtor's financial condition and the

latter referring specifically to written statements of financial condition."  *In re*

*Kirsh*, 973 F.2d 1454, 1457 (9th Cir. 1992).

Section 523(a)(2)(B) requires that any allegedly fraudulent statement

be in writing and be materially false in regard to the debtor's financial situation.

MEMORANDUM OF DECISION - 18

None of the documents involved in the transaction such as the Management

Agreement or the equipment contracts, or even the "statements" about project

costs sent by Defendant to Plaintiffs during construction, constitute a statement

respecting Defendant's financial affairs.  Whether those written documents were

fraudulent or not, Plaintiffs' claim under § 523(a)(2)(B) fails, and so the Court

dismissed it.

> **2.  Plaintiffs Did Not Meet the Requirements for an
> Exception from Discharge under § 523(a)(4).**

Plaintiffs abandoned their claim that Defendant committed fraud as a

fiduciary during presentation of their case in chief.  The Court agreed with

Plaintiffs' decision, and so dismissed the claim on Defendant's Rule 52(c) motion.

To support an exception to discharge under § 523(a)(4), Plaintiffs

must show: "(1) an express trust existed, (2) the debt was caused by fraud or

defalcation, and (3) the debtor acted as a fiduciary to the creditor at the time the

debt was created."  *Banks v. Gill Distribution Centers, Inc.* (*In re Banks*), 263 F.3d

862, 870 (9th Cir. 2001) (citing *Otto v. Niles* (*In re Niles*), 106 F.3d 1456, 1459

(9th Cir. 1997)).  Plaintiffs failed to establish the existence of any trust, or that

Defendant was ever acting as a fiduciary at the time the debt arose.

**B.  Plaintiffs' § 523(a)(2)(A) Claim.**

MEMORANDUM OF DECISION - 19

To except a debt from discharge under § 523(a)(2)(A) Plaintiffs must prove by a preponderance of the evidence that "(1) [Debtor] made representations; (2) which at the time [Debtor] knew were false; (3) [Debtor] made the representations with the intention of deceiving Plaintiff; (4) Plaintiff relied on such representations; and (5) Plaintiff sustained the alleged loss as the proximate result of the representations." *Bell, et al. v. Smith* (*In re Smith*), 98.4 I.B.C.R. 119, 120 (Bankr. D. Idaho 1998) (citing *American Express v. Hashemi* (*In re Hashemi*), 104 F.3d 1122, 1125 (9th Cir. 1996)). "Intent to deceive is a question of fact which may be inferred from the surrounding circumstances of the case." *Farmers & Merchants State Bank v. Cracchiolo* (*In re Cracchiolo*), 00.2 I.B.C.R. 84, 86 (Bankr. D. Idaho 2000) (citing *Cowen v. Kennedy* (*In re Kennedy*), 108 F.3d 1015, 1018 (9th Cir. 1997)).

For a debt to be excepted for fraud, the creditor's reliance upon the false statement need only be justified; reasonable reliance is not required. *Field v. Mans*, 516 U.S. 59, 74–75 (1995); *see also Bell, et al. v. Smith* (*In re Smith*), 98.4 I.B.C.R. 119, 121–22 (Bankr. D. Idaho 1998). "Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." *Field*, 516 U.S. at 71. However, significantly, "a person . . . cannot recover if he blindly relies upon a misrepresentation the falsity of which would be

MEMORANDUM OF DECISION - 20

patent to him if he had utilized his opportunity to make a cursory examination or investigation." *Id.*

Plaintiffs argue that Defendant's sale of the equipment to them at a price significantly in excess of Defendant's cost amounted to fraud. Additionally, Plaintiffs insist that Defendant fraudulently induced Plaintiffs to sign the Management Agreement by representing the total cost of the project would not exceed $500,000. Finally, Plaintiffs argue Defendant committed fraud by continuing during the project to represent the cost of the project to be $500,000. The Court disagrees in all respects.

### 1.  That Defendant was to make a profit on the sale of equipment is not fraud.

Despite Plaintiffs' attempt to characterize them as fraudulent, there is no indication in the purchase orders for the equipment signed by Jo Ann Olson that the price represented Defendant's cost. Defendant was a merchant and a dealer in such equipment. He testified without contradiction that he both sells equipment and builds car wash facilities. Presumably, absent some express agreement to the contrary, Plaintiffs should have anticipated that Defendant would expect to make a profit on the sale of the equipment to them, even separate and apart from his agreement to serve as the construction manager. Defendant was

MEMORANDUM OF DECISION - 21

under no legal duty to disclose his cost or proposed profit on the equipment sales transactions.

Plaintiffs accepted the price for the equipment stated in the purchase contracts. And no evidence was submitted showing that the price Defendant charged Plaintiffs for the equipment was more than its fair retail value. Even if the prices in the purchase orders could be characterized as "excessive," such is no reason to find Defendant guilty of fraud.

Plaintiffs contend that Defendant took advantage of a conflict of interest he created by being both the construction manager and the equipment salesman. Plaintiffs argue that Defendant, as the construction manager, had an obligation to make sure all subcontractors properly performed and failed to do so by allowing himself, as the equipment supplier, to charge an inflated price for the equipment. But, Plaintiffs agreed to purchase the equipment from Defendant, at a specific price, prior to contracting with Defendant to be the construction manager. Such a situation does not amount to fraud.

Plaintiffs also contend that Defendant defrauded them by charging an additional management fee on top of the equipment costs. The Management Agreement allows Defendant a management fee calculated on the total costs of the project. And Plaintiffs must admit that Defendant's management fee was to be assessed on top of the profit presumably included in all the various subcontractor

MEMORANDUM OF DECISION - 22

contracts.  At worst, Defendant may be accused of sharp dealing, and Plaintiffs

may be the victims of poor judgment and a bad business deal.  That does not

amount to fraud.

### 2. Defendant's estimates of the total cost of the project were not fraudulent.

#### a. False Representation.

Defendant, in the Management Agreement he drafted, represented

that the estimated total project cost would be $500,000.  Ex. 1.  Plaintiffs allege

this statement was false because Defendant knew the project would require over

$700,000 to complete.  While Defendant conceded he probably did realize it

would not be possible to build the total car wash for $500,000, he included that

figure in the Management Agreement as an initial estimate to get the project

started, to lower the amount of Plaintiffs' down payment under the Agreement,

and to help Plaintiffs secure financing for the project.

By definition, an estimate is not intended to be exact.  However,

because Defendant admitted that when he inserted the $500,000 figure in the

Management Agreement he knew it would not be possible to complete the car

wash for that amount, that statement was indeed false.

#### b. Intent to Deceive.

MEMORANDUM OF DECISION - 23

Without doubt, Defendant's $500,000 estimate of the total project cost caused confusion.  Plaintiffs contend they believed the project would not exceed $500,000.  But, as noted above, their testimony on this point is unrealistic and ignores the plain meaning of the Management Agreement Plaintiffs signed, which provides for "an estimated $500,000.00 total project cost."  Ex. 1.  The Management Agreement is not ambiguous.  If Plaintiffs were truly opposed to building the car wash if the cost was to exceed $500,000, as they testified, presumably they would have insisted that the contract contain language clearly limiting the project costs to that amount instead of allowing inclusion of  an "estimated" cost of $500,000.  Obviously, the parties intended the $500,000 figure in the Management Agreement as an approximation.

Plaintiffs failed to produce sufficient persuasive proof that Defendant inserted the $500,000 estimate in the Management Agreement with the intent to deceive Plaintiffs.   As noted above, the parties understood the final cost figure would likely exceed this amount, perhaps significantly.

Plaintiffs acknowledged that during construction, they made changes to the car wash plans, such as adding a coffee shop into one of the car wash bays.  Defendant testified as to unforseen problems with the project, such as when a subcontractor damaged a major sewer line that had not showed up on a Digline report.   The additional costs for the coffee shop, water and sewer line repairs, and

MEMORANDUM OF DECISION - 24

permits and fees amounted to $91,562.49.  Ex 6.  There were also problems in

obtaining the necessary permits from the City of Caldwell.

        Plaintiffs knew the price they had agreed to pay for the equipment

and had an estimate of what it could cost to construct the building.  At the

beginning of the parties' business relationship there were several "unknowns" that

would likely figure into the total cost of the project.  While the $500,000 number

was an unrealistically low estimate, Plaintiffs failed to meet their burden to show

that Defendant intended to deceive them by using a fraudulent cost estimate.

### c. Reliance.

        Even if Defendant intended to deceive Plaintiffs by having them

sign an agreement projecting the total construction costs at $500,000, their

reliance on Defendants' cost estimate, based upon other information available and

known to them, was not justifiable.

        The documents offered in evidence, and presented by Defendant to

Plaintiffs before and during construction, show that the cost of the car wash would

exceed $500,000.  These documents lend credibility to Debtor's testimony that the

$500,000 number was merely inserted to get the project started.  Plaintiffs argue

Exhibit 2, the Construction Oversight document, indicates it would cost

approximately $308,663.52 to construct the building.  However, there are several

items and costs not included in that estimate.  Two additional numbers are

MEMORANDUM OF DECISION - 25

handwritten on the document: $42,918 for the coffee shop construction and

$41,895 for power, sewer and water hook up fees, and building permits.  Plaintiffs

had already agreed to purchase equipment from Debtor in the amount of

$226,434.14.  Had she reviewed these numbers, Jo Ann Olson and the others

would have understood the estimated costs were actually over $619,000 plus

Defendant's 8% management fee.  Defendant's disclosure of this information to

Plaintiffs renders Plaintiffs' alleged reliance on the $500,000 figure in the

Management Agreement and elsewhere unjustified.

Additionally, the testimony of both Nancy Roe and Diane Johnson

indicated Jo Ann Olson, who made the decisions concerning this project until she

became too ill to do so, relied heavily upon the advice of others.  Diane Johnson

testified Jo Ann Olson relied upon John Frye for advice in undertaking and

building the car wash.  When questioned why Plaintiffs borrowed $570,000 if they

believed the project was to cost no more than $500,000 it was explained by both

of these Plaintiffs that it was what they had been advised to do. The facts indicate

that Plaintiffs relied upon what was told them by others, including John Frye, as

opposed to using any independent judgment to see what was occurring with the

car wash project.  Plaintiffs did not rely solely upon representations of Defendant

as to the costs of this project.

### e.  Plaintiffs Were Not Defrauded.

MEMORANDUM OF DECISION - 26

Though the number he inserted in the Management Agreement was indeed false, Plaintiffs failed to show Debtor acted with the intent to deceive them when he used $500,000 as an estimate of the total project costs. Plaintiffs also failed to show they were justified in their reliance on that projection. Plaintiffs had other information available to them which showed the total cost of the project would significantly exceed this sum. As a result, the Court concludes the debt cannot be excepted from discharge under § 523(a)(2)(A) for fraud.[9]

### 3. Defendant's continued statements that the total project cost would be $500,000 were not fraudulent.

As discussed above, Defendant's estimate in the Management Agreement that the total project costs would amount to $500,000 was incorrect, something Defendant realized at the time. However, the evidence does not show Defendant included an inaccurate estimate to defraud Plaintiffs.

Similarly, while Defendant continued to use the $500,000 number in Exhibits 3 and 4 in calculating amounts due in the construction progress

---

[9] The Court need not analyze Plaintiffs' claim for damages and the corresponding testimony of their expert. Even so, the Court notes Plaintiffs failed to produce evidence showing they did not receive what they paid Defendant for in this transaction. Indeed, there is nothing to suggest that the value of the car wash is not equivalent to its cost to build. No mention of such an argument was made until Plaintiffs' Response to Defendants' Closing Argument, Docket No. 48, was filed with the Court. The evidence does not support such an argument. And the implications in Plaintiffs' briefing that Defendant may have diverted some of the funds they paid him for use on the project lack any basis in the record.

MEMORANDUM OF DECISION - 27

statements delivered to the Bank and in conversations with Plaintiffs, the evidence fails to persuade the Court Defendant was attempting to deceive Plaintiffs.  In addition, by that time, Plaintiffs had access to documentation showing the cost of the project would be well over $500,000.  And Plaintiffs had authorized changes to the project knowing the addition of the coffee shop would add additional cost to the project.

Defendant deserves criticism for his cavalier approach to the calculations he prepared during the construction project.  Indeed, the Court found the Defendant to be curiously disinterested in many of the details of the costs of this project in his testimony at trial.  In the Court's opinion, Defendant was likely negligent in his failure to be more cognizant of the accruing costs on this project, and in his poor efforts at keeping Plaintiffs informed about those costs.  Clearly, Defendant's various calculations of amounts expended and due from Plaintiffs on the project are difficult to reconcile.  Defendant's lack of diligence in this regard may have given Plaintiffs good cause to terminate his services for failure to properly perform his duties under the Management Agreement.  Even so, the Court is not persuaded, in presenting cost information to Plaintiffs, Defendant intended to defraud them.

Defendant plausibly testified that when he responded to Plaintiffs' questions regarding project costs at the July 2001 meeting, he sincerely believed

MEMORANDUM OF DECISION - 28

the eventual costs of constructing the car wash building would amount to about

$500,000.  However, in making that representation, Defendant believed Plaintiffs

appreciated that this estimate no longer included the $200,000 cost of the

equipment.  Defendant could have, indeed probably should have, been more

precise in his statements, which were likely confusing.  But the Court is not

persuaded that Defendant made these statements with the intent to create a

misunderstanding by Plaintiffs.  And again, at that point in the project, Plaintiffs

would not have been  justified in treating Defendant's statements as precise.   At

best, the statements made by Defendant were approximations.

### C.  Plaintiffs' § 523(a)(6) Claim.

Section 523(a)(6) excepts from discharge a debt "for willful and

malicious injury by the debtor to another entity or to the property of another

entity."  "To be considered willful, the debtor must commit an act akin to an

intentional tort under state law, and the debtor must intend the consequences or

injury resulting from the act rather than just the act itself."  *Farmers & Merchants*

*State Bank v. Cracchiolo* (*In re Cracchiolo*), 00.2 I.B.C.R. 84, 87 (Bankr. D.

Idaho 2000) (citing *Kawaauhau v. Geiger*, 523 U.S. 57, 61–62 (1998)); *See also*

*Spokane Railway Credit Union v. Endicott* (*In re Endicott*), 254 B.R. 471 (Bankr.

D. Idaho 2000).  The act must be more than reckless or negligent.  *Cracchiolo*,

00.2 I.B.C.R. at 87.

MEMORANDUM OF DECISION - 29

In Idaho "[s]lander of title requires proof of four elements: (1) publication of a slanderous statement; (2) its falsity; (3) malice; and (4) resulting special damages." *McPheters v. Maile*, 64 P.3d 317, 321 (Idaho 2003). Such a showing is similar to what must be shown in the context of a § 523(a)(6) nondischargeability action.

In a § 523(a)(6) action, the "willful injury requirement is met only when the debtor has a subjective motive to inflict injury or when the debtor believes that injury is substantially certain to result from his own conduct." *Carrillo v. Su* (*In re Su*), 290 F.3d 1140, 1142 (9th Cir. 2002); *see also Dominguez v. Elias* (*In re Elias*), 03.4 I.B.C.R. 243, 245–46 (Bankr. D. Idaho 2003). "A 'malicious' injury involves '(1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse.'" *Su*, 290 F.3d at 1146–47 (quoting *In re Jercich*, 238 F.3d 1202, 1209 (9th Cir. 2001)); *Elias*, 03.4 I.B.C.R. at 246.

### 1.    Defendant's Actions in Filing the Lien Claims were Neither Willful nor Malicious.

Plaintiffs did not prove that Defendant, in filing his lien claims, acted willfully and maliciously.

Defendant filed his original lien claim shortly after ceasing work when Plaintiffs refused to further fund the project. Defendant may not have acted

MEMORANDUM OF DECISION - 30

prudently in ceasing work.  But the Court accepts Defendant's explanation that he

filed the lien, not intending to in any way damage Plaintiffs, but in good faith to

protect his financial interests, and those of his subcontractors to whom he was

obligated.  Moreover, given the amount Plaintiffs paid to subcontractors after they

took over the project, the amount of Defendant's lien claim, while likely not

precisely correct, was not so excessive as to indicate the lien was asserted with a

bad motive.  The same is true a year later when Defendant amended the lien claim.

While the presence of the liens may have prevented Plaintiffs from

refinancing the project as a practical matter, the Court is also not persuaded

Defendant acted maliciously.  To the extent Defendant was owed money under the

Management Agreement to pay subcontractors and his management fees, he was

legally entitled to lien the property.  *See* Idaho Code § 45-501 *et seq.*

The Idaho Supreme Court has instructed that "the fact that a lien

claimant claims a higher amount than is ultimately awarded does not require the

district court to invalidate the claimant's entire lien." *Electrical Wholesale Supply

Co., Inc. v. Nielson*, 41 P.3d 242, 253 (Idaho 2001) (citing *Barber v. Honorof*, 780

P.2d 89, 91 (Idaho 1989)) (Awarding only $1,069.12 when the amount originally

claimed was $51,571).  In other words, under Idaho law, Defendant's lien was not

invalid simply because the amount claimed proved to be different than the actual

amount owed absent a specific finding of abusive conduct "devoid of any good

MEMORANDUM OF DECISION - 31

faith effort to comply with the lien statutes." *Id* at 252.  Similarly, even if the

original or subsequent lien claims may have exceeded the actual amounts due,

there is no indication that Defendant acted with malice in filing them.  Asserting a

lawful lien, even if the amount claimed is inaccurate, is not the sort of  wrongful

act targeted by the Bankruptcy Code as malicious.

No portion of Plaintiffs' judgment debt against Defendant should be

excepted from discharge on the basis that the lien was asserted willfully and

maliciously.

## Conclusion

Plaintiffs failed to prove that the debt owed to them by Defendant

under the state court judgment should be excepted from Defendant's discharge in

bankruptcy pursuant to 11 U.S.C. § 523(a)(2)(A) or § 523(a)(6).  A separate

judgment will be entered.


Dated:  January 6, 2006

_____
Honorable Jim D. Pappas
United States Bankruptcy Judge



MEMORANDUM OF DECISION - 32